Eugenio **LLAMERA**, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 485–84C.

United States Claims Court.

Oct. 11, 1988.

---

Peter S. Herrick, Miami, Fla., for plaintiff.

Platte B. Moring, III, with whom were Asst. Atty. Gen. John R. Bolton, David M. Cohen, Director, and Thomas W. Petersen, Asst. Director, Washington, D.C., for defendant.

## OPINION

ANDEWELT, Judge.

In this action, plaintiff, Eugenio Llamera, a Cuban national and a permanent resident alien in the United States, seeks damages relating to the United States Coast Guard's (Coast Guard) seizure and subsequent loss of plaintiff's boat, the "Lettie–O." Plaintiff alleges that defendant's actions (1) breached an implied-in-fact contract pursuant to which defendant agreed to exercise due care while in possession of the vessel, and (2) violated plaintiff's constitutional rights under the fourth and fifth amendments.

This action is presently before the court on defendant's motion for summary judgment. Plaintiff contests defendant's motion, but requests that if the court concludes that it lacks jurisdiction with respect to any aspect of plaintiff's claim, the court should transfer the case to the United States District Court for the Southern District of Florida, pursuant to 28 U.S.C. § 1631. For the reasons explained herein, defendant's motion is sound and the case will be transferred.

### Facts

The material facts are not in dispute. On August 30, 1980, plaintiff's brother, Baldomera M. Llamera, and two other crew members left Miami, Florida, aboard the Lettie–O. The next day, the Coast Guard intercepted the vessel in the Key West Channel. Lieutenant Steven L. Hamilton and a three-man boarding party from the Coast Guard Cutter Alert (Alert) boarded the vessel. The Commanding Officer of the Alert directed Lieutenant Hamilton to seize the Lettie–O for a violation of the Cuban Assets Control Regulations, 31 C.F.R. § 515.415, which under specified circumstances prohibits the transportation to Cuba of a vessel containing Cuban nationals. Plaintiff's brother was given a receipt for the seized vessel, and he and the other crew members were transferred to the Alert where they were arrested.

When seized, the vessel was operating with a defective steering mechanism. While the Coast Guard was transporting the Lettie–O and its crew to the Truman Annex in Key West, Florida, a girdle securing the Lettie–O slipped and destroyed the top of the vessel's deck house.

The Lettie–O arrived at the Truman Annex on September 1, 1980. Commander Perkins, the officer in charge, received the vessel and its crew. Another officer performed a routine boarding check and concluded that the Lettie–O was in violation of a number of Coast Guard statutes and regulations.[1] The United States Customs Service decided that it lacked sufficient evidence to take any action under the Cuban Assets Control Regulations against either the Lettie–O or its crew. The crew members were then released, but the Coast Guard retained control of the Lettie–O because there was no valid state registration on board.

The only proof of ownership plaintiff's brother had in his possession were a Florida State Registration that listed Michael Eagan as the owner of the Lettie–O and a notarized, handwritten receipt purportedly signed by Eagan, dated August 22, 1980, acknowledging the payment of $1,000 by plaintiff for the Lettie–O. There was no application on board for the transfer of the

---

1. The officer concluded that the Lettie–O was in violation of 46 U.S.C. § 1469 and 33 C.F.R. § 173.21–.25 (prohibiting use of a vessel lacking a valid certificate of registration on board); 46 U.S.C. § 1470 and 33 C.F.R. § 173.27 (requiring display of a vessel registration number); 33 C.F.R. § 155.450 (requiring display of oil pollution placard); and 33 C.F.R. § 159.7 (prohibiting operation of a vessel lacking an authorized marine sanitation device).

registration from Eagan to plaintiff. Plaintiff's brother tried to persuade Commander Perkins to release the vessel based on these documents, but Commander Perkins responded that the documents were not sufficient and that the Lettie–O could not be taken from the dock until a valid state registration was presented. Commander Perkins told plaintiff's brother that he could stay with the vessel or place someone on board to watch it for him.[2]

A few days later, plaintiff and his brother met with Commander Perkins at the Coast Guard station in Key West. Once again, the only proof of ownership presented by plaintiff were the documents mentioned above. Commander Perkins gave plaintiff a letter explaining that the Lettie–O was being detained by the Coast Guard pending proof of ownership, that the Coast Guard assumed no liability for the vessel, that the vessel would remain in detention until proof of ownership was presented to the Marine Safety Department in Key West, and that the vessel could not leave under its own power until the violations listed in the boarding report were corrected.[3] In addition, at some point in time, Commander Perkins also informed plaintiff that he could file a claim for any damages to the vessel at the Legal Department of the Seventh Coast Guard Command in Miami, Florida.

Plaintiff never presented additional proof of ownership to the Marine Safety Department. He did, however, on three occasions discuss the Lettie–O with officials at the Legal Department of the Seventh Coast Guard Command. Plaintiff submitted a claim for damages but never received any compensation.[4]

Meanwhile, the travail of the Lettie–O continued. The vessel sunk while at Pier 7 of the Truman Annex on September 7, 1980, and was subsequently refloated. On January 29, 1981, a Coast Guard Hearing Officer assessed a penalty of $350 against

plaintiff's brother and the vessel for the violations of federal laws and regulations discussed in n. 1, *supra*. Thereafter, on September 28, 1981, the Key West Redevelopment Agency (KWRA), which administered the Truman Annex including the vessels stored there for the Federal Government, sold the vessel under a different name at public auction for $10. The sale was purportedly pursuant to Florida state law, which entitled the KWRA to recover outstanding storage charges and other fees.

It is not clear whether the Coast Guard received advance notification of the KWRA's intent to sell the Lettie–O, but on October 15, 1981, the Coast Guard informed the KWRA that the vessel should not be released or removed from the Truman Annex without notifying the Coast Guard. The Lettie–O remained at the Truman Annex until February 1982, but its location thereafter is unknown.

Plaintiff filed this action on September 24, 1984. In his amended complaint, plaintiff alleges that defendant breached an express or implied contract by failing to exercise due care with respect to the Lettie–O (Counts 1 and 2) and that defendant's seizure and detention of the vessel violated plaintiff's "due process rights" under the fourth and fifth amendments (Counts 3 and 4). Plaintiff seeks as damages the value of the Lettie–O plus more than $100,000 to compensate him for his inability to use the vessel for fishing in the time period prior to the filing of his complaint. In its answer, defendant counterclaims for the $350 that the Coast Guard had assessed against plaintiff's brother and the Lettie–O on January 29, 1981.

### Analysis

**A.  Counts 1 and 2—Breach of Contract**

Counts 1 and 2 seek monetary damages from the United States for breach of an

---

**2.** Since plaintiff's brother spoke only Spanish, Commander Perkins used an interpreter.

**3.** The letter was written in English. This same information was conveyed orally to plaintiff and his brother by a Spanish interpreter.

**4.** The Coast Guard maintains that plaintiff's original claim was incomplete and that subsequent attempts within the statute of limitations to remedy the deficiencies did not result in a proper claim.

express or implied contract between the parties. The undisputed facts summarized above clearly negate the formation of an express contract, and plaintiff has not pursued his allegation of express contract either in his brief or at oral argument. Instead, plaintiff focuses exclusively on his contention that the government's loss of the Lettie–O breached "an implied-in-fact contract of bailment" pursuant to which the Coast Guard was obliged to exercise due care in its handling of the vessel.

■ To establish an implied-in-fact contract, plaintiff must demonstrate the same basic elements as are involved in an express contract—a mutual intent to contract including an offer, acceptance, and consideration. *Fincke v. United States*, 230 Ct.Cl. 233, 244, 675 F.2d 289, 295 (1982) (citing *Baltimore and Ohio R.R. Co. v. United States*, 261 U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816 (1923)). In addition, since the government is not bound by the unauthorized acts of its agents, plaintiff must also demonstrate that the government officials whose actions were relied upon had authority to bind the government in contract. *See Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985); *EWG Assocs. Ltd. v. United States*, 231 Ct.Cl. 1028, 1029 (1982); *Jascourt v. United States*, 207 Ct.Cl. 955, 955–56, 521 F.2d 1406 (1975), *cert. denied*, 423 U.S. 1032, 96 S.Ct. 562, 46 L.Ed.2d 405 (1975); *Housing Corp. of Am. v. United States*, 199 Ct.Cl. 705, 711–12, 468 F.2d 922, 925 (1972).

The grant of summary judgment is appropriate when there is no dispute as to any issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed. 2d 202 (1986). Herein, summary judgment is warranted because the undisputed facts demonstrate the absence of each of the prerequisites for an implied-in-fact contract

described above. The parties did not have a mutual intent to enter into a contract—there was no offer, acceptance, or consideration passing between them. In addition, the relevant Coast Guard employees lacked authority to bind the government in contract.

### 1. *The Absence of a Mutual Intent to Contract*

■ The facts simply do not suggest that the Coast Guard representatives, at any relevant time, engaged in conduct that indicated an intent to enter into an agreement to exercise due care while in possession of the Lettie–O. The Coast Guard's initial decision to seize the Lettie–O for a violation of the Cuban Assets Control Regulations and its later decision to prohibit plaintiff from moving the Lettie–O pending presentation of a valid state registration were each taken pursuant to perceived police power authority under controlling statutes and regulations.[5] In that setting, there was no reason for the Coast Guard representatives to extend an offer to enter into a contract that would oblige the Coast Guard to exercise due care while in control of the Lettie–O, and the facts do not suggest that they did.

The Coast Guard representatives did give plaintiff a receipt for the vessel, and in addition indicated to plaintiff that the vessel was being detained pending proof of ownership and that plaintiff could file a claim for damages. But these actions merely clarified the options available to plaintiff in the context of the Coast Guard's exercise of its police power; they did not evidence any intent to enter into a bailment agreement that would create obligations on the Coast Guard with respect to plaintiff's vessel beyond those already provided by law.

Indeed, rather than exhibiting an intent to be responsible for the condition of the Lettie–O, Commander Perkins demonstrat-

---

5. 14 U.S.C. § 89 authorizes Coast Guard officials to "make ... searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States." The Ports and Wa-

terways Safety Act gives the Coast Guard the authority to order any vessel within the territorial waters to "anchor in a manner [it] directs" if it has reasonable cause to believe that the vessel does not comply with any Coast Guard regulations. 33 U.S.C. § 1223(b).

ed an intent to the contrary both when he told plaintiff's brother that he could stay with the vessel or have someone board the vessel to watch it for him, and when, a few days later, he stated that the Coast Guard was assuming no responsibility whatsoever for the vessel.[6] Thus, the undisputed facts reveal the absence of any "promise, representation or statement by any ... government official that plaintiff's boat would be damage-free or carefully handled" during the course of the seizure and detention. *Shaw v. United States*, 8 Cl.Ct. 796, 799 (1985). *See also Hatzlachh Supply Co. v. United States*, 7 Cl. Ct. 743, 749–50 (1985); *Ysasi v. Rivkind*, 856 F.2d 1520, 1524–25 (Fed.Cir.1988).

Next, not only is there no evidence suggesting that the Coast Guard extended an offer to enter into a contract, but also there is no evidence to suggest any acceptance of an offer by plaintiff or the passage of consideration between the parties. At no relevant time did plaintiff or his representatives engage in any voluntary action that could be deemed either the acceptance of an offer or the consideration for an agreement. At the time of the seizure, the crew simply responded, as legally obliged, to the Coast Guard's order to leave the vessel. Similarly, at the time the Coast Guard decided to detain the vessel pending proper proof of ownership, plaintiff and his brother had no viable choice but to leave the vessel in its anchored position.

In support of his argument that an implied-in-fact bailment contract should be found, plaintiff relies primarily on *Alliance Assurance Co. v. United States*, 252 F.2d 529 (2d Cir.1958). In *Alliance*, the plaintiff brought suit against the United States to recover the value of imported goods that mysteriously disappeared from an official warehouse of the Customs Service. There-

in, the Customs Service used an elaborate ticketing system to keep track of goods detained for inspection and to aid in returning the goods to the owner upon completion of the inspection. The owner of the goods presented its tickets to the Customs Service and sought return of its goods, but the goods had been lost. *Id.* at 531.

The court in *Alliance* found an implied-in-fact bailment agreement between the parties, concluding that the elaborate ticketing system was indicative of a promise to return the goods to the plaintiff and that "since [Customs] voluntarily undertook a bailment of the goods in question, a promise on its part to use due care during the term of the bailment can and should be implied." *Id.* at 532. The court concluded that the consideration necessary for a binding contract was present, quoting *Coggs v. Bernard*, 2 Ld.Raym. 909, Eng. Reprint 107 (1903), for the proposition that in situations involving a gratuitous bailment of goods from the owner to a third party, "the owner's trusting [the third party] with the goods is a sufficient consideration to oblige him to a careful management." *Id.* at 533.

Plaintiff alleges that the same type of bailment agreement should be implied here, both where the Coast Guard gave plaintiff's brother a receipt when it seized possession of the Lettie–O, and where plaintiff relied upon the Coast Guard to return the vessel when the proper papers were presented and, in the duration, to exercise due care with respect to the vessel. But the undisputed facts simply do not suggest that the parties intended to create a gratuitous bailment.

First, as explained above, rather than exhibiting an intent to enter into a bailment agreement, the contemporaneous actions of the Coast Guard indicated an intent to dis-

---

6. Plaintiff contends that it was a violation of controlling regulations for the Coast Guard to have maintained possession of the Lettie–O after the Customs Department declined to take action under the Cuban Assets Control Act. For reasons explained in Section B *infra,* plaintiff is incorrect; the action taken by the Coast Guard was consistent with the regulations. But even if plaintiff were correct, a finding of governmental impropriety would not itself significantly advance plaintiff's argument that an implied-in-fact contract existed. Plaintiff has not presented any evidence to suggest that the Coast Guard did not perceive itself to be acting within its police power. A post hoc determination that the Coast Guard acted beyond its lawful power would not itself indicate that the Coast Guard intended to enter into a bailment contract when it decided not to return the Lettie–O.

claim responsibility for the condition of the vessel. Second, unlike *Alliance*, the government did not receive the vessel as the result of a voluntary, trusting act by its owner.

In *Alliance*, the owner of the goods had two choices—to import into the United States pursuant to United States import regulations or, in the alternative, to dispose of the goods outside the United States. The owner voluntarily chose to import the goods into the United States. This decision could benefit the owner of the goods by permitting him to market the goods in the United States. In addition, from the perspective of the government, the decision could benefit United States consumers by making the foreign wares available in the United States. The elaborate ticketing system of the Customs Service, which was designed to facilitate the quick and efficient return of goods, served to encourage the merchant's voluntary decision to import the goods into the United States.

However, in the case at bar, the actions of the government did not encourage a voluntary decision by plaintiff to entrust his vessel to the Coast Guard. Plaintiff did not voluntarily turn the Lettie-O over to the Coast Guard. Rather, the Coast Guard's seizure and subsequent detention of the Lettie-O were exercises of police power taken without plaintiff's consent and against his will. There is simply no basis here to imply any intent on the part of the government or plaintiff to enter into a bailment agreement and no basis for finding the passing of any consideration between them.[7]

In order to defeat a properly supported motion for summary judgment by demonstrating the existence of a dispute as to a material fact, the responding party must present sufficient evidence of the fact to permit the trier of fact reasonably to find

in its favor as to the existence of that fact. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. Herein, even when the facts are interpreted in a light most favorable to plaintiff, *see United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), plaintiff has not demonstrated a dispute as to any fact that is material to the grant of summary judgment to defendant on plaintiff's implied-in-fact contract claims. Summary judgment on Counts 1 and 2 therefore is appropriate.

### 2. *Lack of Contract Authority*

Defendant also seeks summary judgment on the distinct ground that the relevant Coast Guard employees lacked authority to bind the government in contract. To demonstrate lack of such authority, defendant submitted two affidavits, one of which was by Commander Perkins. The affidavits indicate that the Coast Guard representatives who dealt with plaintiff and his brother lacked authority to contract on behalf of the United States. In his response, plaintiff did not submit any contrary affidavits, but instead relies on two arguments.

█ Plaintiff's first argument, in effect, is that since Commander Perkins' affidavit indicates that he had responsibility for the detention of vessels, it follows that he necessarily had authority to enter into an implied-in-fact contract relating to the release of any detained vessel. But that simply is not so. The authority to bind the government by contract does not necessarily flow from the responsibility to detain vessels for law enforcement purposes. Commander Perkins' affidavit specifically states that he "was given no contracting authority whatsoever ... to enter into any type of contract for or on behalf of the Government," and plaintiff has not pointed to any evidence that disputes that statement.

Plaintiff's second argument is that even if Commander Perkins did lack contract

---

7. In its post-argument supplemental brief, plaintiff cites a series of decisions which discuss the rights and obligations in a bailment agreement under Florida state law. *See Dunham v. State*, 140 Fla. 754, 192 So. 324 (1939); *InterOcean (Free Zone), Inc. v. Manaure Lines, Inc.*, *"Manana V"*, 615 F.Supp. 710 (S.D.Fla.1985); *Balogh v. Jewelers Mut. Ins. Co.*, 167 F.Supp. 763 (S.D.Fla.

1958), *aff'd*, 272 F.2d 889 (5th Cir.1959); *Palm Beach Aviation, Inc. v. Kibildis*, 423 So.2d 1011 (Fla.Dist.Ct.App.1982). These cases, however, are inapposite because each involves a traditional voluntary bailment between private parties rather than actions by a government entity under its perceived police powers.

authority, defendant nevertheless would be legally barred from denying the existence of any implied-in-fact contract under the doctrine of equitable estoppel. But this argument misunderstands the scope of the doctrine of equitable estoppel.

▇▇ The doctrine of equitable estoppel, when properly invoked,[8] prevents a party from denying the existence of a contract that already exists; it cannot be used to create a contract that otherwise would not exist. *Pacific Gas & Elec.*, 3 Cl.Ct. at 340. As explained above, however, the authority of a government official to contract is a prerequisite to the formation of a contract in the first place. *Orchards*, 749 F.2d at 1575; *EWG Assocs.*, 231 Ct.Cl. at 1029; *Jascourt*, 207 Ct.Cl. at 955–56. The doctrine of equitable estoppel, therefore, cannot be used to fill the gap resulting from an absence of authority to contract. "In equitable estoppel cases the law requires that plaintiff prove that the official whose act(s) is relied upon had the requisite authority." *Hazeltine Corp. v. United States*, 10 Cl.Ct. 417, 440 (1986) (citing, *e.g.*, *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 85, 591 F.2d 629, 630 (1979)), *aff'd* 820 F.2d 1190 (Fed.Cir.1987), quoted in *Miles Farm Supply, Inc. v. United States*, 14 Cl.Ct. 753, 757 (1988).[9]

The affidavits submitted by defendant are sufficient to demonstrate the lack of contract authority, and plaintiff has failed to create a dispute on this issue by presenting contrary evidence. *See Jechura v. United States*, 9 Cl.Ct. 753, 754 (1986), *aff'd mem.*, 809 F.2d 791 (Fed.Cir.1986); *Royal Indem. Co. v. United States*, 178

Ct.Cl. 46, 51–52, 371 F.2d 462, 465 (1967), *cert. denied, Jersey State Bank v. Royal Indem. Co.*, 389 U.S. 833, 88 S.Ct. 33, 19 L.Ed.2d 93 (1967). Defendant, therefore, is also entitled to judgment as a matter of law on Counts 1 and 2 on the ground that the government employees involved lacked authority to bind the government in contract. *See Liberty Lobby*, 477 U.S. at 247, 106 S.Ct. at 2509.

### B. Counts 3 and 4—Violations of the Fourth and Fifth Amendments

As drafted, Counts 3 and 4 allege violations of the "due process" clauses of the fourth and fifth amendments to the Constitution. After oral argument, however, plaintiff acknowledged that this court does not have jurisdiction to consider claims for monetary damages based on violations of the fourth amendment or on violations of the fifth amendment's due process clause. *See, e.g.*, *LaChance v. United States*, 15 Cl.Ct. 127, 129–30 (1988); *Shaw*, 8 Cl.Ct. at 800.

In subsequent briefing, however, plaintiff contended that his constitutional claim encompasses, in addition, a claim under the fifth amendment takings clause. Plaintiff bases this takings claim on his allegation that the Coast Guard acted in an unauthorized and illegal manner when it detained the Lettie–O after the Customs Service decided not to take action under the Cuban Assets Control Act. Plaintiff does not dispute that his vessel was in violation of Coast Guard regulations. Plaintiff contends, however, that the controlling statute, 33 U.S.C. § 1223(b), gives the Coast

---

**8.** The elements of equitable estoppel are: (1) the party to be estopped knows the operative facts; (2) the party to be estopped either must intend that its conduct be relied upon or must act in such a way that the party alleging estoppel had a right to believe reliance was intended; (3) the party alleging estoppel must be ignorant of the operable facts; and (4) the party alleging estoppel must rely on the other party's conduct to its detriment. *Pacific Gas & Elec. Co. v. United States*, 3 Cl.Ct. 329, 340 (1983), *aff'd mem.*, 738 F.2d 452 (Fed.Cir.1984).

**9.** In *Thanet*, the Court of Claims stated:
In the proper circumstances the doctrine of estoppel may be applied against the Government. Such an estoppel, however, may not be based on the unauthorized representation or act of an officer or employee who is without authority in his individual capacity to bind the Government. *Emeco Industries, Inc. v. United States*, 202 Ct.Cl. 1006, 485 F.2d 652 (1973); *Branch Banking & Trust Co. v. United States*, 120 Ct.Cl. 72, 98 F.Supp. 757, *cert. denied*, 342 U.S. 893 [72 S.Ct. 200, 96 L.Ed. 669] (1951). One who deals with the Government assumes the risk that the officials with whom he deals have no authority. *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380 [68 S.Ct. 1, 92 L.Ed. 10] (1947).

Guard only the authority to issue rules concerning the operation of vessels and not the authority to detain vessels. Thus, plaintiff argues, the Coast Guard's detention of the Lettie-O was unlawful and "it is the denial of due process in conjunction with the owner's or possessor's property rights" which gives the Claims Court jurisdiction under the Tucker Act.

■ Plaintiff's argument is unavailing for two reasons. First, plaintiff misreads and misapplies the controlling statute. The statute, 33 U.S.C. § 1223(b), provides in pertinent part that "the Secretary may order any vessel ... to operate or anchor in a manner he directs if ... he has reasonable cause to believe such vessel does not comply with any regulation issued under this chapter or any other applicable law." The statute therefore does not limit the Coast Guard to issuing orders that oblige a vessel to operate in a particular way, but permits the Coast Guard in addition to order a vessel "to anchor."

■ Herein, the Coast Guard did not exceed the bounds of its statutory authority. When the Coast Guard informed plaintiff's brother that he could not remove the Lettie-O from the Truman Annex, the Coast Guard did not exclude plaintiff or his representatives from the vessel. Indeed, Commander Perkins specifically indicated that plaintiff could stay with the vessel or have someone board the vessel to safeguard it.

The Coast Guard merely refused to permit plaintiff to move the vessel from its anchored position until the regulatory violations were addressed and a proper certificate of ownership was presented. Thus, the Coast Guard merely ordered the vessel "to ... anchor in a manner ... direct[ed]," as permitted by the statute.

■ Second, even assuming that the Coast Guard did exceed the bounds of its statutory authority, plaintiff's fifth amendment claim still would not be proper. The Court of Appeals for the Federal Circuit and the Court of Claims before it have consistently held that jurisdiction under the Tucker Act does not extend to actions for recovery of damages based on unauthorized acts of government officials. *Florida Rock Industries, Inc. v. United States,* 791 F.2d 893, 898 (Fed.Cir.1986) (citing *Armijo v. United States,* 229 Ct.Cl. 34, 663 F.2d 90 (1981)); *NBH Land Co. v. United States,* 217 Ct.Cl. 41, 44-45, 576 F.2d 317, 319-20 (1978); *Trone v. United States,* 213 Ct.Cl. 671,. 672, 553 F.2d 105 (1977).[10] "A taking within the meaning of the [fifth] amendment must [be] an intentional appropriation of the property to the public use, and the appropriation must [be] authorized by law." *Vansant v. United States,* 75 Ct.Cl. 562, 566 (1932).[11] Since plaintiff's takings claim is predicated on the government acts being unauthorized and in violation of plaintiff's due process rights,[12] it is

---

**10.** In *Trone,* the plaintiff asserted that various federal officials had acted "wrongfully, negligently, and in abuse of their power and discretion" in taking various actions. The court explained that such claims "sound in tort and would clearly be outside our jurisdiction." 213 Ct.Cl. at 672. *See also Torres v. United States,* 15 Cl.Ct. 212, 215-16 (1988); *Montego Bay Imports, Ltd. v. United States,* 10 Cl.Ct. 806, 809-10 (1986).

**11.** Plaintiff relies upon *Lowther v. United States,* 480 F.2d 1031 (10th Cir.1973), to support its argument that the Tucker Act extends to unauthorized acts of Government officials. In *Lowther,* the Tenth Circuit stressed the "peculiar facts" there involved. *Id.* at 1035. In addition, the continued viability of *Lowther,* even in the Tenth Circuit, has been questioned because the *Lowther* decision was issued prior to the Supreme Court clarifying in *United States v. Mitchell,* 463 U.S. 206, 216, 103 S.Ct. 2961, 2967, 77

L.Ed.2d 580 (1983), that the Tucker Act "does not provide any substantive rights enforceable against the United States for money damages." *See United States v. One (1) 1979 Cadillac Coupe DeVille,* 833 F.2d 994, 999 (Fed.Cir.1987). In any event, however, to the extent that *Lowther* suggests that fifth amendment takings claims can arise from unauthorized acts of government officials, it is simply inconsistent with unequivocal precedent of the Court of Appeals for the Federal Circuit and of the Court of Claims, both of which are binding on this court.

**12.** Plaintiff does not suggest that the Coast Guard's actions herein could constitute a fifth amendment takings in the absence of this purported violation of his due process rights. Nor would such a claim be viable. The Coast Guard's detention of plaintiff's vessel until such time as plaintiff produced a valid state registration could not constitute a taking under the takings analysis that has been articulated by the

not a proper claim under the Tucker Act.[13]

#### C. Transfer of this Action

■ 28 U.S.C. § 1631 obliges this court to transfer this action to any other court in which the action could be brought if this court finds (1) that there is a want of jurisdiction, and (2) that transfer "is in the interest of justice." Both requirements are satisfied here.

First, this court lacks jurisdiction over certain of plaintiff's claims. As explained above, the court lacks jurisdiction to hear plaintiff's claims under the fourth amendment and under the fifth amendment's due process clause. Next, the allegation in the complaint of a breach of an implied contract is broad enough to encompass not only breach of a contract implied in fact, but also breach of a contract implied in law. However, this court's jurisdiction over implied contracts is limited to contracts implied in fact and does not extend to contracts "based merely on equitable considerations and implied in law." *United States v. Minnesota Mutual Investment Co.,* 271 U.S. 212, 217, 46 S.Ct. 501, 503, 70 L.Ed. 911 (1926). In addition, while the Coast Guard was at least arguably negligent in its handling of the Lettie-O, this court does not have jurisdiction to consider claims for damages sounding in tort. *Shaw,* 8 Cl.Ct. at 799.

Second, transfer of this case would serve the interest of justice. Plaintiff appears to have been damaged by the arguably negligent acts of the Coast Guard. The Lettie-O, which plaintiff apparently purchased and owned, was damaged by the Coast Guard while being hauled to the Truman Annex, was sunk and subsequently resurfaced, and was sold at auction and subsequently lost. In this factual setting, to the extent that plaintiff has any viable legal claims against the Coast Guard, it is in the interest of justice to permit plaintiff to make such claims to a court of competent jurisdiction.

#### Conclusion

For the foregoing reasons, the Clerk is directed to enter judgment transferring this case to the District Court for the Southern District of Florida.

IT IS SO ORDERED.

---

Supreme Court.· *See, e.g., Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2658, 57 L.Ed.2d 631 (1978), *reh'g denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978). (Three factors of particular significance in the takings analysis are (1) the economic impact of the regulation, (2) the extent to which the regulation interferes with investment-backed expectations, and (3) the character of the governmental action.)

**13.** Defendant makes one additional attack on this court's jurisdiction to hear this action. Defendant argues that pursuant to 28 U.S.C. § 2502, plaintiff, a Cuban national, cannot bring suit in this court unless plaintiff demonstrates that citizens of the United States have the right to prosecute claims against the Cuban Government in Cuban courts. Defendant contends that plaintiff has not demonstrated the required reciprocity in Cuban courts and, therefore, has failed to demonstrate that jurisdiction over his claim properly lies in this court. Plaintiff responds that it would be an unconstitutional violation of the fifth amendment to apply 28 U.S.C. § 2502 to an alien who is also a permanent resident in the United States. Defendant has not cited any case in which Section 2502 has been applied against resident aliens, and the briefs of the parties on this point are not comprehensive. In view of this court's conclusions articulated above that plaintiff cannot otherwise secure a judgment in his favor in this court, the court will decline to address the jurisdiction-related constitutional issues raised in defendant's proposed interpretation of 28 U.S.C. § 2502.