**ALDE, S.A., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 91–1382C.**

United States Court of Federal Claims.

March 24, 1993.

---

A.P. Walter, Jr., Coral Gables, FL, for plaintiff.

Harold D. Lester, Jr., Washington, DC, with whom was Acting Asst. Atty. Gen., Stuart E. Schiffer, for defendant.

## OPINION

NETTESHEIM, Judge.

This case is before the court on cross-motions for summary judgment. Plaintiff, a Dominican Republic corporation, seeks compensation for damage and loss of income resulting from the seizure of plaintiff's aircraft by the U.S. Customs Service. Plaintiff claims that an implied-in-fact bailment contract was created when the aircraft was seized or that the seizure of the aircraft constituted a taking without just compensation. Argument is deemed unnecessary.

### FACTS

Although the parties disagree as to the legal significance of the underlying facts, the substance of the facts material to resolution of the cross-motions is not in dispute. On March 2, 1989, the U.S. Customs Service (the "Customs Service") seized a 1953 McDonnell Douglas DC–3 aircraft ("the aircraft"), Registration No. 18477A, belonging

to Alde, S.A. ("plaintiff"), for failure to request landing rights for the aircraft in violation of 19 U.S.C. § 1436 (1988).[1]

By letter dated March 13, 1989, Mamie E. Pollock, District Director for the Customs Service, San Juan, Puerto Rico, notified plaintiff that it would have to pay a $1,500.00 administrative penalty, $96.24 in seizure costs, and $602.58 in storage costs before the aircraft would be remitted. In addition, plaintiff was required to submit a "Hold Harmless Agreement" prior to remittance. On the same date, the Customs Service applied to the United States District Court for the District of Puerto Rico for a warrant to seize the aircraft. In the affidavit attached to the Customs Service's application for the warrant, agent Roberto Jusino stated that plaintiff's aircraft had been seized previously for landing rights violations and was suspected of violating United States Export Declaration laws, in particular, 22 U.S.C. § 401 (1988).[2] The warrant was issued and the aircraft was seized again the same day pursuant to the warrant. Also on March 13, 1989, plaintiff was issued a Custody Receipt for Retained or Seized Property for the aircraft and its contents. The aircraft was later transferred on March 27, 1989, to the Northrop Aviation facility in San Juan, Puerto Rico, for storage.

On April 12, 1989, the Customs Service informed plaintiff of its right to petition for relief from the aircraft's forfeiture. By letter dated April 26, 1989, counsel for plaintiff officially requested that judicial forfeiture proceedings be commenced by the United States Attorney's Office. The Customs Service responded on June 5, 1989 by informing plaintiff's counsel that plaintiff was required to post a $5,000.00 bond in accordance with 19 U.S.C. § 1608 before the case would be referred to the U.S. Attorney's Office. In a letter to Ms. Pollock, Aug. 25, 1989, counsel for plaintiff posted the $5,000.00 bond and again requested that the matter be referred to the U.S. Attorney's Office for commencement of judicial forfeiture proceedings.

Throughout this exchange plaintiff's aircraft continued to be stored at Northrop's San Juan facility. The course of the proceedings, however, was changed on September 25, 1989, when nature intervened in the form of Hurricane Hugo. The hurricane caused extensive damage to much of the seized property stored there. Plaintiff's aircraft was one of the items to fall victim to the hurricane. Northrop later reported that the aircraft was also damaged by theft shortly after the hurricane struck.

On February 19, 1990, plaintiff petitioned the United States District Court for the District of Puerto Rico for the return of the aircraft. Since the motion was not opposed by the Customs Service, the district court granted it. This order was amended on April 19, 1990, to require the Customs Service to return plaintiff's $5,000.00 bond and to absorb storage and maintenance costs in addition to returning the aircraft. By letter dated March 26, 1990, the Customs Service informed plaintiff that the aircraft would be returned, but the Customs Service required plaintiff to pay storage and seizure costs. It also denied liability for any damage to the aircraft caused by Hurricane Hugo. The Customs

---

1. 19 U.S.C. § 1436(a)(2) states that it is unlawful "to present any forged, altered, or false document, paper, or manifest to a customs officer under section 1433(d) of this title without revealing the facts." Subsection (b) provides that "any conveyance used in connection with any such violation [of subsection (a) ] is subject to seizure and forfeiture."

2. Subsection (a) of this section reads, in pertinent part:
 [W]henever it is known or there shall be probable cause to believe that any arms or munitions of war or other articles are intended to be or are being or have been exported or removed from the United States in violation of law, the Secretary of the Treasury, or any person duly authorized for the purpose by the President, may seize and detain such arms or munitions of war or other articles and may seize and detain any vessel, vehicle, or aircraft containing the same or which has been or is being used in exporting or attempting to export such arms or munitions of war or other articles. All arms or munitions of war and other articles, vessels, vehicles, and aircraft seized pursuant to this subsection shall be forfeited.
22 U.S.C. § 401(a).

Service notified plaintiff by letter on May 4, 1990, that the aircraft would be returned "as is." When plaintiff failed to take custody of the aircraft, this notice was repeated on February 28, 1991.

Plaintiff took possession of the aircraft on March 28, 1991. Plaintiff then filed an administrative claim with the Customs Service for $299,585.00 for damage to the aircraft. The claim was denied by the Regional Commissioner on October 22, 1991.

Plaintiff filed its complaint in the United States Claims Court, now the Court of Federal Claims, on August 22, 1991, claiming damages totalling $299,585.00 for breach of an implied-in-fact bailment contract or for a taking of private property without just compensation.

## DISCUSSION

Defendant contends that plaintiff must establish that an implied-in-fact contract existed between the Customs Service and itself to support jurisdiction over the claim. According to defendant, plaintiff cannot prove either that the Customs Service's actions in seizing the aircraft constituted an offer for bailment, or that plaintiff accepted this offer. With regard to the taking claim, defendant asserts that an unlawful seizure does not constitute a taking as recognized by the Constitution. Seizures executed for the purpose of instituting forfeiture proceedings are not takings in a constitutional sense.

Plaintiff responds that an implied-in-fact bailment contract may be inferred from conduct and that "a subjective meeting of the minds to all aspects of the implied-in-fact contract" need not exist. Plf's Br. filed Feb. 16, 1993, at 3. The action of the Customs Service, *i.e.*, giving a receipt to plaintiff which described the condition of the aircraft at the time of seizure as "fair" and the subsequent payment of the administrative fine by plaintiff, evinced an offer and acceptance of a bailment contract. Plaintiff claims that paying the fine and posting the required bond were voluntary actions that manifested its agreement to comply with the Customs Service's conditions for return of the aircraft. Plaintiff

had a right to expect that if it complied with these conditions that it would receive its property in the condition described on the receipt.

Plaintiff asserts that the Customs Service's agents had authority to bind the Government in contract. It claims that Ms. Pollock's letter informing plaintiff of its rights was "in itself evidence of her actual authority." Plf's Br. filed Feb. 16, 1993, at 9. The inventory officers who issued the receipt for the aircraft had authority "to create receipts giving to Alde evidence of an implied-in fact contract." *Id.* In addition, Blanca Moran, Assistant U.S. Attorney Fernandez, and District Court Judge Fuste "had the authority to acknowledge the existence and enforce the obligations between the parties." *Id.* at 9–10.

As for the taking claim, plaintiff asserts that the Customs Service's actions were so egregious as to constitute a taking. Plaintiff points to the argument made by the defendant that the Government is not liable for the unauthorized or illegal acts of its agents as an admission that the Government invaded plaintiff's property rights. This invasion was "of such magnitude, that a constitutional taking should be implied." Plf's Br. filed Feb. 16, 1993, at 14.

### 1. *Summary judgment standards*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence would permit a reasonable jury to return a verdict in favor of the non-movant. *Id.* Both plaintiff and defendant, as the moving parties, have the burden of establishing that there are no genuine material issues in dispute and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–

53, 91 L.Ed.2d 265 (1986). Each party, in its capacity as the opponent of summary judgment, is entitled to "all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

### 2. The implied bailment contract claim

In order for the Court of Federal Claims to have jurisdiction over an implied contract claim, it must be one "implied in fact and not one based merely on equitable considerations and implied in law." *United States v. Minn. Investment Co.*, 271 U.S. 212, 217, 46 S.Ct. 501, 503, 70 L.Ed. 911 (1926). It has long been established that the Tucker Act, 28 U.S.C. § 1491(a)(1) (1988), provides the court with jurisdiction over claims based on implied-in-fact contracts. *Ysasi v. Rivkind*, 856 F.2d 1520 (Fed.Cir.1988).

Implied-in-fact contracts must be established by demonstrating the same elements necessary to the formation of an express contract: mutual intent to contract including an offer, acceptance, and consideration. *Ysasi* 856 F.2d at 1525. The officer whose conduct is relied upon must also have actual authority to bind the Government in contract. *Kollsman v. United States*, 25 Cl.Ct. 500, 514 (1992); *Scope Enterprises, Ltd. v. United States*, 18 Cl. Ct. 875 (1989). "[N]o contract can be created binding the Government absent actual authority of the Government's agents to bind the Government." *City of Alexandria v. United States*, 3 Cl.Ct. 667, 674 (1983) (citation omitted), *rev'd on other grounds*, 737 F.2d 1022 (Fed.Cir.1984).

The courts have confronted the problem of implied bailment contracts on a number of occasions. These cases evince a uniform reluctance to find an implied bailment contract in cases similar to the one at hand where plaintiff's property has been seized pursuant to the Government's exercise of its police power.[3] *See Ysasi*, 856 F.2d at 1526 (no bailment contract formed in seizure of truck by Immigration and Naturalization Service for suspected violation of immigration laws); *Marshall v. United States*, 21 Cl.Ct. 497 at 499 (1990) (U.S. Marshals Service's seizure of powder suspected of being in violation of Federal Food, Drug and Cosmetic Act did not make Government bailee for seized property); *Scope Enterprises*, 18 Cl.Ct. at 884 (seizure by Customs Service of money used in unlawful export of military and high technology did not result in bailment agreement); *LaChance v. United States*, 15 Cl.Ct. 127, 130 (1988) (no bailment contract formed in seizure by Drug Enforcement Agency of money suspected of being involved in illegal drug purchase).

It is the very nature of a bailment contract that makes plaintiff's claim so difficult to prove in these cases. As this court stated in *Scope Enterprises:* "Bailment connotes a trust or an understanding that one party will deliver personal property to another for a certain purpose, with the express or implied understanding that the chattel will be returned or accounted for when the purpose is accomplished or when reclaimed by the bailor." 18 Cl.Ct. at 884.

The manifestation of agreement between parties is crucial in determining whether an implied-in-fact contract exists. Absent some form of understanding between the parties, formation of an implied-in-fact bailment contract cannot take place.

---

3. In *Kuehne & Nagel, Inc. v. United States*, 17 Cl.Ct. 11 (1989), the court recognized that "in seizing merchandise under the customs laws, the United States voluntarily enters into an implied-in-fact contract of bailment with the owners of the merchandise." *Id.* at 17. This recognition, however, does not square with the weight of authority holding to the contrary. The property in question in *Kuehne & Nagel* was a letter of credit which was used by plaintiff to secure the release of property originally seized by the Customs Service. This situation is distinct from the case at bar which deals specifically with the originally seized property. In addition, even though the court in *Kuehne & Nagel* recognized the existence of a contract between the parties, it held that the Customs Service did not owe plaintiff "an unalterable duty to *return* the letter of credit, but only that Customs owed Kuehne a duty to *account for the letter of credit.*" *Id.* at 18 (emphasis in original).

*Ysasi,* 856 F.2d at 1520. At some point the court must find that an offer to guarantee the safety of the seized property was extended by the Customs Service and that plaintiff accepted this offer freely.

█ When property is seized pursuant to the Government's police powers, it is particularly difficult to assume formation of a bailment contract. A seizure by the Government of property that it has reason to believe is being used in violation of the law does not automatically create bailment. *LaChance,* 15 Cl.Ct. at 130. Ordinarily no reason would exist for law enforcement officers to offer a bailment agreement to a person whose property is being seized. *Marshall,* 21 Cl.Ct. at 501. "Purely unilateral acts" of government officials acting under the police power simply do not suggest a mutual intent to enter into a bailment contract. *Marshall,* 21 Cl.Ct. at 499.

In *Llamera v. United States,* 15 Cl.Ct. 593 (1988), plaintiff's boat was seized by the Coast Guard for violation of the Cuban Assets Control Regulations and a number of Coast Guard statutes and regulations. Llamera was given a receipt for his boat and was informed in writing that the Coast Guard assumed no liability for the vessel. Llamera was also informed of his right to file a claim for damages with the Coast Guard's legal department. When Llamera subsequently sued for damage to his vessel occurring while it was being detained by the Coast Guard, the court refused to view the unilateral acts of the Coast Guard as evidence of any intent to enter into a bailment agreement.

Similarly, the court had difficulty assuming acceptance of this offer by the target of the seizure:

Plaintiff did not voluntarily turn ... [his boat] over to the Coast Guard. Rather, the Coast Guard's seizure and subsequent detention of the ... [boat] were exercises of the police power taken without plaintiff's consent and against his will. There is simply no basis here to imply any intent on the part of the Government or plaintiff to enter into a bailment agreement and no basis for finding the passing of any consideration between them.

15 Cl.Ct. at 599.

█ In the instant case, it is equally difficult to find evidence of offer or acceptance by either of the parties. The Customs Service informed plaintiff by letter through counsel dated March 13, 1989, that the aircraft had been seized. Attached to this letter was a "Hold Harmless Agreement" that plaintiff was required to complete before the aircraft would be returned. The Hold Harmless Agreement explicitly disclaims liability of the Customs Service for any damage done to the aircraft while in the Customs Service's possession. Defendant has submitted an affidavit by Ms. Pollock in which she denies ever representing, or intending to represent, to plaintiff that the Customs Service would maintain plaintiff's aircraft as a bailee.

Plaintiff alleged in its complaint that several events indicated the formation of a bailment contract between plaintiff and the Customs Service:

(1) the Customs Service's requirement that plaintiff pay administrative penalties and file a bond;

(2) plaintiff's payment of this bond;

(3) the district court's order requiring return of the bond and assumption of storage and maintenance costs by the "seizing agency"; and

(4) payment of storage costs by the Customs Service and return of the bond.

In its cross-motion for summary judgment, plaintiff adds that the description of the aircraft's condition as "fair" on the receipt given to plaintiff constituted an agreement of the Customs Service to "retain the goods in the condition [described on the receipt]." Plf's Br. filed Feb. 16, 1993, at 5. The payment of the bond and fine secured an agreement to have the aircraft returned in the condition described in the receipt. The payment was voluntary since plaintiff could have refused to pay the fine and relinquished control of the aircraft. It would make no sense, plaintiff asserts, for it to pay for the return of a worthless aircraft.

The actions that plaintiff cites fall short of the evidence of mutual intent to contract required for the formation of an implied-in-fact contract. Plaintiff's allegations, combined with the disclaimers of liability cited by defendant, present a claim quite similar to the one asserted in *Llamera*. Here, too, the unilateral acts of the Customs Service and the compelled acquiescence of plaintiff can hardly be viewed as a manifest intent to enter into a bailment contract. Plaintiff's attempt to distinguish *Llamera* on the ground that the case involved a claim without any documentation is unconvincing. Although it is true that plaintiff possesses more documentation than the plaintiff in *Llamera*, "more" does not mean "enough." This documentation still fails to establish the voluntary assent needed to form a bailment contract.

The Customs Service seized plaintiff's aircraft pursuant to governmental police powers. At the time of the seizure, the aircraft was suspected of being used to further a crime. Both of the statutes on which the Customs Service based its seizure of the aircraft provided that the property seized was subject to forfeiture.[4] The Customs Service eventually did seek forfeiture of the aircraft. In light of these facts, it is difficult to fathom how plaintiff believed the Customs Service was indicating that it would safeguard the aircraft and its contents for later return to plaintiff. Quite to the contrary, the Customs Service was actively seeking to permanently deprive plaintiff of ownership of the aircraft through forfeiture proceedings. One whose property is seized subject to forfeiture cannot reasonably assert that the Government is "holding the property for a specific purpose" and that the property will be returned or safeguarded. The only reasonable understanding of "forfeiture" is that the property rights of the owner have been or will be extinguished.[5]

In addition, plaintiff had no choice but to pay the administrative fine and bond. This compelled conduct cannot be construed as evidence of the voluntary acceptance required for formation of a bailment contract. Although plaintiff is correct in asserting that it could have refused to pay the fine and foregone remittance of the aircraft, its premise that payment of this fine created an agreement to safeguard the property is inaccurate.

The Customs Service's alleged offer to remit the aircraft in return for the payment of the fine appears in its March 13, 1989 letter to plaintiff. The letter states that the aircraft "will be remitted ... under the following conditions." The conditions listed were the payment of the administrative penalties and the execution of the hold harmless agreement. Viewed in isolation this language appears to be an offer to contract. When the context of the letter is taken into account, however, it becomes manifest that there was no such offer. The Customs Service had imposed an administrative penalty on plaintiff. This penalty could be satisfied either by the forfeiture of the aircraft or the payment of a monetary fine. The letter in question informed plaintiff of its options for satisfying the penalty; it was not, as plaintiff asserts, an offer to exchange merchandise (the aircraft) for money (the fine). Plaintiff was required by law to satisfy the penalty imposed by the Customs Service. When it chose to pay the penalty, a contract for the return of the aircraft was not formed. If an agreement was implied by the payment of the fine, it was that the Customs Service would accept the payment in satisfaction of the penalty. No bailment agreement regarding the aircraft can be implied from the payment of the fine.

Evidence that the Customs Service did not intend to enter into a bailment contract

---

**4.** Property seized on suspicion of involvement in the illegal export of war materials "shall be forfeited." 22 U.S.C. § 401(a). Any conveyance used in violation of arrival, reporting or entry requirements "is subject to seizure and forfeiture." 19 U.S.C. § 1436(b).

**5.** "Forfeiture" is defined as "a divestiture of specific property without compensation; it imposes

a loss by the taking away of some preexisting valid right without compensation.... Loss of some right or property.... Loss of some right or property as a penalty for some illegal act." *Black's Law Dictionary* 650 (6th ed. 1990) (citations omitted).

abounds. The Customs Service repeatedly denied any liability for damage to the aircraft and insisted that plaintiff execute a Hold Harmless Agreement before the aircraft was remitted. Several communications between the Customs Service and counsel for plaintiff deny any assumption of liability on the part of the Customs Service.[6] Whereas the Customs Service may have agreed to release the aircraft upon payment of the fine by plaintiff, plaintiff adduces no evidence that the Customs Service also assumed responsibility as a bailee.

Similarly, compliance by the Customs Service with the order of the district court cannot be viewed as acceptance of a bailment contract. Compliance with a court order is mandatory. Such compliance cannot be seen as a surrogate for the volitional acts required in contract formation. Plaintiff therefore cannot establish the formation of a contract, no less a breach of such a contract, under which it can base a claim for damages to the aircraft.

Finally, plaintiff has not carried its burden of proving that the person " 'whose conduct is relied upon had actual authority to bind the government in contract.' " *Hatzlachh Supply Co., Inc. v. United States*, 7 Cl.Ct. 743 at 751 (1985) (quoting *H.F. Allen Orchards*, 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985)). Whereas defendant has submitted an affidavit disclaiming any authority to bind the Customs Service in contract, plaintiff has submitted nothing more than bare allegations of authority. Plaintiff's showing is insufficient to withstand summary judgment.

*Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984) (counter-affidavit or counter-statement of fact required to defeat summary judgment); *see Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1404 (Fed.Cir. 1984) (mere assertions by counsel that factual issues exist is insufficient to avoid summary judgment). Plaintiff has failed to establish a cognizable contract claim within the jurisdiction of the court.

3. *The fifth amendment taking claim*

▆ The Tucker Act gives the Court of Federal Claims jurisdiction over claims for damages based on a violation of a source of law set forth in the Act which can fairly be interpreted as mandating the payment of compensation by the Federal Government. *United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976). A taking occurs when the rightful property, contract, or regulatory powers of the Government are employed to control rights or property which have not been purchased. *Florida Rock Industries, Inc. v. United States*, 791 F.2d 893, 898–99 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987). Thus, if rights or property are taken through unlawful action, there is no taking. *Id.* In the context of a summary judgment motion, if a plaintiff alleges that the Government acted illegally, the averment must be taken as true. Because a taking can only occur when the Government acts lawfully, alleging that property was taken unlawfully eliminates the foundation of a takings claim.[7]

---

6. For example, letter from Ms. Pollock to A.P. Walter, Jr. dated March 13, 1989 (conditioning remission of aircraft on payment of seizure and storage costs and execution of attached Hold Harmless Agreement); letter from Ms. Pollack to A.P. Walter, Jr. dated March 26, 1990 (conditioning return of aircraft on payment of storage and seizure costs and completion of attached Hold Harmless Agreement; also denying liability under the Kosak exception to the Tort Claims Act for damage done to the aircraft by Hurricane Hugo); letter from Ms. Pollack to A.P. Walter, Jr. dated May 4, 1990 (advising that plaintiff would be allowed to pick up the aircraft "as is."); letter from Ms. Pollack to A.P. Walter dated February 28, 1991 (informing that

plaintiff must effect remission of aircraft "as is" no later than April 15, 1991).

7. Whether the initial seizure of the aircraft was a valid exercise of governmental police power is beyond the competence of this court. The Court of Federal Claims does not have jurisdiction to hear challenges to the propriety of actions of the Federal Government. *Golder,* 15 Cl.Ct. 513, 518 (rejecting claim that seizure and release of aircraft constitutes a fifth amendment taking); *see LaChance,* 15 Cl.Ct. at 130 ("[I]n reviewing a seizure and forfeiture case taken through administrative procedures, it would be improper for a court to reach the merits of the administrative decision.")

■ There is a difference between government action that constitutes an exercise of the police power and action that constitutes a compensable taking. If the Government acts to secure a benefit for the public, a taking arises. Government action taken to prevent harm to the public is an exercise of the police power. *Scope Enterprises*, 18 Cl.Ct. at 883. Government action aimed at protecting the life, health, and property of its citizens "traditionally has constituted a non-compensable exercise of the Government's police power." *Jarboe–Lackey Feedlots, Inc. v. United States*, 7 Cl.Ct. 329, 338–339 (1985) (citing *Mugler v. Kansas*, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887)).

■ As in respect of cases dealing with the formation of an implied bailment contract based on the seizure of property by the Government, assertions that a taking occurred have been uniformly rejected. Seizures carried out by the Government under its police power are not takings. In *Scope Enterprises* the Customs Service seized classified military equipment as part of a "sting" operation. The owner of the property seized brought suit in this court claiming that the seizure was a taking. This court rejected this assertion, holding that the Government's action "obviously was intended not for public use but, rather, to prevent public harm. No compensable taking occurred." 18 Cl.Ct. at 883.

Plaintiff's claim is almost identical to the one addressed by this court in *Golder v. United States*, 15 Cl.Ct. 513 (1988). In *Golder* plaintiff's aircraft was seized by the United States Drug Enforcement Administration for an alleged violation of the Controlled Substances Act, 21 U.S.C. § 881 (1988). In the subsequent forfeiture proceedings, a jury verdict was entered denying the forfeiture. Plaintiff then filed suit for damages, alleging that the seizure was a violation of the fifth amendment takings and due process clauses. The Claims Court applied the reasoning set forth in *United States v. One (1) 1979 Cadillac Coupe de Ville*, 833 F.2d 994 (Fed.Cir.1987), in holding that "the government seizure and temporary possession of the aircraft did not amount to a Fifth Amendment taking." 15 Cl.Ct. at 519.

Plaintiff claims that the seizure and retention of the aircraft by the Customs Service constituted a deprivation "so great that a taking must be implied." Plf's Br. filed Feb. 16, 1993, at 13. Plaintiff points to defendant's assertion that it is not liable for the illegal or unlawful acts of its government agents as a justification for compensation. If extended, defendant's reasoning would allow it to

invade the home of an individual with a warrant, but without probable cause, confiscate his belongings without justification, destroy those goods, and then gallantly and confidently argue the victim's claim for compensation is without merit because the Government's actions were so egregious and unreasonable as to not warrant liability.

Plf's Br. filed Feb. 16, 1993, at 14.

While the court is sympathetic with plaintiff's concern about a possible erosion of constitutional rights, plaintiff has failed to make out a compensable taking claim. Instead, its assertions that the Government is liable for the wrongful acts of its agents appear to constitute a tort claim. *See Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 609, 372 F.2d 1002, 1010 (1967) (claim against government for damages "occasioned by wrongful regulatory action smacks more of tort than of non-tortious obligation.").

Plaintiff's aircraft was seized and held pending forfeiture proceedings in United States district court. Although the jury in the proceedings eventually found that the aircraft should not be forfeited, this determination did not render the seizure a taking. Plaintiff is not entitled to compensation for the seizure.

### CONCLUSION

Accordingly, based on the foregoing, defendant's motion for summary judgment is granted. The Clerk of the Court shall dismiss the complaint.

No costs.