SCOPE ENTERPRISES, LTD., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 615–88C.

United States Claims Court.

Dec. 7, 1989.

Donald Horowitz, Hackensack, N.J., for plaintiff. Kim D. Ringler and Susan J. Bard, of counsel.

Randall J. Bramer, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Larry Spong, U.S. Dept. of Treasury, of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on defendant's motion for summary judgment, having been transferred to this judge after completion of briefing. Thereafter, plaintiff filed supplemental authorities that arose during the interval after briefing.

## FACTS

Scope Enterprises, Ltd. ("plaintiff"), a corporation organized under the laws of the Isle of Man, United Kingdom, and having a place of business in Lisbon, Portugal, brings suit requesting return of money confiscated by the United States Department of Treasury's Customs Service ("Customs") pursuant to a "sting" operation.

The following material facts are either undisputed or not disputed in the manner provided for by RUSCC 56(f). From 1982 to 1986, Customs conducted "Operation Exodus," a sting operation intended to halt the illegal flow of high technology and military items to foreign nations. Customs, through its undercover agents Kelley M.S. Wilson, Fred Ghio, and Kyle Windes, created and operated "Ameritech," a front company located in Irvine, California, which would acquire and unlawfully export military and high technology items for interested persons. Agents Ghio and Windes (collectively referred to as "the agents") actively posed as representatives of Ameritech, while Agent Wilson worked with them in a behind-the-scenes capacity.

Events in this case began unfolding in January 1984 when Jackie Singer first contacted agents Ghio and Windes. After an initial meeting, the agents participated in a series of periodic undercover meetings through January 1985 with various Portuguese individuals, including Eduardo F.R. Gill Ojeda, Carlos Ribeiro, Moises S. Broder, and Alfonse Bonacho. Mr. Singer was not heard from again regarding this matter.

The agents' first deal for Ameritech transpired between themselves and Messrs. Broder and Bonacho. Broder and Bonacho, who each lived in Portugal, initially desired helicopter and radar equipment parts for an Iranian buyer. Meetings ensued and, at one held on February 3, 1984, Agent Ghio informed Bonacho that Bonacho would need an export license from the United States Department of State in order to export such parts to Iran and that such a license was unattainable. Bonacho replied, " 'Of course not.' " Declaration of Fred Ghio, Jan. 17, 1989, ¶ 5. While discussing inflated prices due to the illegal nature of the sale and export of the equipment during a February 7, 1984 meeting, Mr. Broder stated: " 'Let's face it. I know that it's not

kosher ... [.] We all know that it's not kosher.'" Ghio Decl. *id.*

At the same meeting, Broder paid Agent Ghio $28,000.00 in $100.00 bills for the purchase of two parts associated with the United States' Hawk Missile System, which the United States provided to Iran prior to the overthrow of the last Shah. Messrs. Broder and Bonacho took delivery and requested additional related parts.

Negotiations for these related parts continued into April 1984, when the agents reached an agreement with Broder and Bonacho regarding the type and quantity of parts to be purchased. However, this second transaction never occurred. Broder telephoned Agent Ghio from Portugal and stated that Bonacho had stolen the purchase money totalling between $250,000.00 and $350,000.00. As a result of the theft, according to Broder, an Iranian colonel who travelled to Los Angeles, California, to finalize the deal had returned to London, England.

Further negotiations between the agents and Broder continued. In June 1984 Broder informed the agents that he had located a new Iranian customer, based in Spain, for the parts that Bonacho and he agreed to purchase in March. However, this deal also fell through. Broder communicated with the agents in August and October 1984, but no further purchase occurred.

No other event of import concerning the agents or Ameritech occurred until January 7, 1985, when Carlos Ribeiro, a resident of Lisbon, Portugal, telephoned Ameritech and arranged a meeting with the agents for the next day. On January 8, 1984, Ribeiro arrived with Eduardo Ojeda, and Ribeiro, acting as interpreter for Ojeda, explained that Ojeda was the main purchaser of military radar components and that Broder had been working for Ojeda all along. Ojeda gave no indication that he was representing any entity other than himself. Only at a much later date did the agents learn of any connection between Ojeda and plaintiff.

Because of Bonacho's theft, Ojeda no longer trusted Broder and, hence, wanted a direct relationship with Ameritech. Agent Ghio again explained, this time to Ojeda, that since the requested equipment was not sold domestically and required licenses and certificates for export, any such transaction potentially could result in serious legal consequences for all parties concerned. Ojeda then handed the agents a "wish" list of Hawk Missile and radar parts which were either the same as or similar to the parts that Broder attempted to purchase earlier. From the conversation it was evident to the agents that the equipment was destined for Iran.

Through several telexes, Ojeda agreed to buy parts for the Hawk Missile System and an early-warning radar system for a total of $619,300.00. In furtherance of the deal, on January 11, 1985, Ribeiro and Agent Windes agreed via telephone that Windes would create false invoices for the parts, labelling them in a nondescript manner, such as television sets. Two days later, Agent Ghio informed Broder, who was in Lisbon, that Ojeda and Ribeiro, who were in California, were ready to complete the deal with Ameritech. On January 17, 1985, having flown to Los Angeles, Broder had a heated discussion with Ojeda and Ribeiro regarding Broder's trustworthiness. After reviewing the equipment, Broder, Ojeda, and Ribeiro participated in the transaction. Agent Ghio advised Ojeda and the other men several times that they were about to purchase classified equipment and, as such, required a license for export to Iran and that such license could not be obtained legally. During this meeting Ribeiro gave the agents a cashier's check for the equipment in the amount of $619,300.00. Ojeda, Broder, and Ribeiro then accepted the radar equipment from the agents; loaded it onto a truck with the agents' assistance; and drove to a storage facility in Orange County, California, where they unloaded the goods. The agents next deposited the cashier's check into a government bank account. The facility remained under Customs' surveillance for two days.

The purchased equipment was classified under the United States Munitions List, 22 C.F.R. § 121.1 (1985), and required an ex-

port license or written approval from the State Department prior to shipment.

On January 18, 1985, Ribeiro consigned a parcel to DHL, an overseas carrier, for shipment to Antonio Lopes in Lisbon. Customs agents examined and seized the parcel which contained, in part, copies of performance data sheets copied by Ribeiro while at Ameritech. On the following day, January 19, Ribeiro drove Ojeda and Broder to Los Angeles International Airport, and, as they attempted to board a flight to Lisbon, Agent Wilson arrested the two for conspiring to illegally export military equipment from the United States. Customs officials arrested Ribeiro later that day at the same airport. Further, Customs seized the equipment from the Orange County storage facility and returned it to the Department of Defense, from which it had been on loan.

This same day Agent Wilson, with Broder's consent, examined the contents of Broder's briefcase. Found in the briefcase was an agreement dated July 2, 1984, between plaintiff and a Spanish corporation named Texconsultancy & Engineering, Inc., written on plaintiff's letterhead, with the signatures of Directors Ojeda and Antonio L.C. Gomes Lopes affixed thereto. The agreement bound plaintiff to purchase the radar equipment referenced above; transport it to Lisbon; and then ship it to Tehran, Iran. In part, the contract explained that the total contract price included expenses for "[r]e-export, taxes, handling at Lisbon airport plus aircraft to Tehran.... [and] Insurance from Lisbon to Tehran...." The agreement also provided that the parts were to be shipped in three separate consignments, with the second and third consignments contingent "upon confirmation that the first shipment left the USA." Further, the agreement contemplated that Ojeda and Broder were to share at least $61,000.00 for payment of services and expenses in obtaining the equipment.

A grand jury convened in the United States District Court for the Central District of California indicted Ojeda, Broder, Bonacho, and Singer, charging them with conspiracy to violate the Arms Export Control Act, 22 U.S.C. § 2778 (1982). No. CR 85–117, Grand Jury Indictments (C.D.Cal. Feb. 12, 1985) (unpubl.). The grand jury also indicted Broder and Bonacho for illegally exporting radar equipment under the same statute. On May 13, 1985, Ojeda and Ribeiro pleaded guilty to the conspiracy charge and Broder pleaded guilty to the illegal exportation charge. In accepting his plea, the court found that Ojeda was "the authorized agent of [plaintiff] ..., acting with express authority of said [corporation]." Transcript of Proceedings, No. 85–117(A)–HLH (C.D.Cal. June 10, 1985), at 53.

On June 3, 1985, Broder was sentenced to imprisonment for one year and one day, plus a $50,000.00 fine. Ribeiro received three years' probation and a $10,000.00 fine. One week later, on June 10, 1985, the district court sentenced Ojeda to one year and one day's imprisonment and imposed a $100,000.00 fine. However, the court suspended the fine pending the outcome of a determination of whether the United States would be obliged to return the $619,300.00 to either Ojeda or plaintiff, as Ojeda had requested by motion.

This motion for return of money has a separate and detailed history of its own. Ojeda originally moved for return of monies paid to Ameritech on April 16, 1985. Appended to this motion was an affidavit of Lopes which averred that both he and Ojeda were original directors of plaintiff and that a third director, Carlos Manuel Ramalho Ferreira, became a director in December 1984. Affidavit of Antonio Luis da Casta Gomes Lopes, Feb. 1, 1985, 3. The federal district court continued the motion to afford Ojeda an opportunity to establish an interest in the money. *United States v. Ojeda, et al.,* No. CR 85–0274–HLH (C.D. Cal. Apr. 16, 1985) (Criminal Minutes). On May 13, 1985, the court denied the motion without prejudice, allowing renewal in the California district court or in this court upon completion of Ojeda's criminal proceeding. The district court stated further that Ojeda failed to establish an interest in the money because he submitted only a hearsay declaration of his attorney, demon-

strating that plaintiff, and not Ojeda, owned the funds at issue. Further, the hearsay declaration did not exclude the possibility that plaintiff itself received the funds as agent for another, possibly a foreign government. The court also found that Ojeda was an authorized agent for plaintiff. *United States v. Ojeda, et al.,* No. CR 85–0274–HLH (C.D.Cal. May 13, 1985) (Criminal Minutes). Plaintiff did not intervene in these proceedings.

On October 21, 1985, Ojeda brought a renewed motion for return of the $619,-300.00, arguing that he possessed sufficient standing to request return of the funds based on his position as plaintiff's co-owner and director and on his active and personal participation in its business. The district court denied this latest motion, concluding that plaintiff, not Ojeda, was the owner of the funds and that no reason existed to "disregard the corporate entity." *United States v. Ojeda, et al.,* No. CR 85–117–HLH (C.D.Cal. Oct. 21, 1985) (Civil Minutes). The court suggested that plaintiff would "have to pursue its own remedies, presumably in the [Claims Court]." *Id.* Again, plaintiff did not intervene in response to this motion.

On January 13, 1987, plaintiff filed an administrative tort claim against the United States, alleging fraud, withholding of information, and illegal creation and conduct of the sting operation. Plaintiff has undertaken no further action on this claim. On January 14, 1987, Broder filed a similar tort claim. Plaintiff's counsel also represented Broder in this matter. Plaintiff filed suit in this court on October 24, 1988, some three years after the conclusion of the federal district court proceedings.

On December 20, 1988, plaintiff served defendant with interrogatories and requests for production of documents. On January 23, 1989, defendant moved to suspend proceedings pending resolution of its dispositive motion filed on the same date. Plaintiff failed to respond to this motion.

## DISCUSSION

In its complaint plaintiff attempts to illustrate the illegality of the Government's action by asserting the following: There is no statutory authority for the money's forfeiture; the Government breached an express or implied-in-fact contract with plaintiff; the Government holds the money as bailee for plaintiff; the Government has taken plaintiff's property without just compensation in violation of the fifth amendment to the United States Constitution; it would be unjust for the Government to retain both the funds and the parts; and the Government violated plaintiff's fifth amendment due process rights by conducting similar activities in the "Iran–Contra" affair.

1. Plaintiff asserts that it possesses standing to bring an action for breach of an express or implied-in-fact contract under the agency concept of an undisclosed principal. Defendant counters that since there was no privity of contract between plaintiff and the Government, no contract could ever exist.

As a general rule of agency law, an undisclosed principal may enforce a contract entered into by its agent. *See, e.g., Interbras Cayman v. Orient Victory Shipping Co., S.A.,* 663 F.2d 4, 6 (2d Cir. 1981); *Southern Indus., Inc. v. United States,* 326 F.2d 221, 224 (9th Cir.1964); ("[T]he principal may sue third parties on contracts entered into for its benefit by the agent.") (citations omitted); *Restatement (Second) of Agency,* § 302 (1958). However, different standards apply when an undisclosed principal attempts to bind the Government to a contract. "The Government consents to be sued only by those with whom it has privity of contract...." *Erickson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984) (citing *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1550–52 (Fed.Cir.1983)). This "no privity" rule mandates that only a party with a direct contractual relationship with the United States may bring a breach claim under the Tucker Act. *Merritt v. United States,* 267 U.S. 338, 340–41, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925) (where petition did not allege any express or implied-in-fact contract between itself and the United States, recovery was denied); *see*

*Putnam Mills Corp. v. United States*, 202 Ct.Cl. 1, 8, 479 F.2d 1334, 1337 (1973) (where plaintiff fails to show any contract between itself and the United States, "it cannot, as a subcontractor, recover directly from the United States for amounts owed to it by the prime."); *Brazier Forest Prods., Inc. v. United States*, 11 Cl.Ct. 468, 469 (1987) (absent privity a subcontractor may not sue government).

The cited cases all involve a subcontractor's attempt to sue the Government directly. However, as discussed below, the cases are sufficiently analogous to be controlling here. "It is a hornbook rule that, under ordinary government prime contracts, subcontractors do not have standing to sue the government under the Tucker Act, 28 U.S.C. § 1491, in the event of an alleged government breach or to enforce a claim for equitable adjustment under the Contract Disputes Act of 1978." *Erickson Air Crane*, 731 F.2d at 813 (citations omitted). "Thus, the no-privity rule is synonymous with a finding that there is no express or implied contract between the government and a subcontractor." *Johnson Controls*, 713 F.2d 1550.

■ However applicable plaintiff's argument based on the rule of agency law concerning an undisclosed principal may be in a purely private civil case, plaintiff may not ignore the fact that the Government is a party to the present suit. No privity exists between plaintiff and the Government. From January 1984 until January 1985, when the deal was negotiated and finalized, plaintiff's existence was never made known to any of the Customs agents. At no time before consummation of the deal did Ojeda or anyone associated with him ever intimate to the agents that the former were acting for anyone but themselves. As far as the agents knew, the parts were sold for the benefit of an Iranian buyer, not a British corporation. Not until Agent Wilson searched Broder's briefcase did the agents learn of plaintiff's connection to the parts sale. This search only took place after the parts were tendered, purchased, stored, and seized and after the arrests of Ojeda, Ribeiro, and Broder. No express or implied contract existed between plaintiff and the Government due to lack of privity. *Johnson Controls*, 713 F.2d at 1550.

■ 2. Defendant next asserts that, even if privity is present, no express or implied contract exists due to the agents' lack of authority to bind the Government to the alleged contract at issue. Plaintiff contends that if the Government's position carries the day, it would mean that in a sting operation government employees may enter into contractual arrangements and take the money of innocent third parties without incurring the obligation to return the money or be accountable for damages. Plaintiff's contention ignores the controlling law and improperly characterizes what action the Government actually took in the sting operation under review.

First, for several reasons plaintiff is not an innocent third party. Ojeda, plaintiff's co-owner and director, personally initiated the purchase from the agents and received a warning from Agent Ghio that the equipment could not be exported legally without consent from the State Department. Ojeda pleaded guilty to conspiracy to violate the export control laws in the California federal district court proceeding. Also, the same court found that Ojeda acted with plaintiff's express authority in completing the transaction with Ameritech. Further, the July 2, 1984 contract signed by Directors Ojeda and Lopes specifically bound plaintiff to re-export the parts to Tehran, Iran, and also conditioned the later two consignments on the first consignment's successful export from the United States. While it is true that Ojeda and his confederates took no affirmative steps to export the radar parts, but merely stored them in a warehouse, evidence of actual export is unnecessary to support the Government's conspiracy case. The possession of the parts by Ojeda and his associates, in conjunction with the July 2, 1984 contract and statements made to the agents asserting that the ultimate buyer's nationality was Iranian, permits a strong and unrebutted inference that Ojeda's purpose in obtaining the radar parts was illegally to export them overseas. Plaintiff has made no showing

to dispute defendant's contention that plaintiff knew of Ojeda's goals and activities and, therefore, is deemed to have known of Ojeda's actions. Plaintiff is not an innocent third party.

Second, defendant submitted unrebutted declarations of Agents Wilson, Windes, and Ghio stating that they were without any authority to bind the Government to any type of contract. In support of these assertions, defendant presented a declaration by the Director of Customs' Contracts and Procurement Division, who declared that none of the three agents held a contracting officer's warrant issued by Customs, thereby signifying that they lacked authority to bind the Government in a contract. Plaintiff has made no contrary showing, nor did plaintiff seek discovery for the purpose of developing its own evidence in response to these sworn statements. *See* Order entered Oct. 23, 1989.[1]

"In the law of government contracts, no contract can be created binding the Government absent actual authority of the Government's agents to bind the Government." *City of Alexandria v. United States*, 3 Cl.Ct. 667, 674 (1983), *rev'd on other grounds*, 737 F.2d 1022 (Fed.Cir. 1984). "[I]n respect to an implied contract, the officials of the United States whose acts might bind it, must have authority to do so, just as the case is with an express contract." *City of Alexandria*, 737 F.2d at 1027 (citing *Grismac Corp. v. United States*, 214 Ct.Cl. 39, 556 F.2d 494 (1977) (to establish an implied-in-fact contract against the government the proponent must prove, *inter alia*, actual authority of the officer whose conduct was relied upon)); *National Audubon Soc'y, Inc. v. Watt*, 678 F.2d 299, 307–08 (D.C.Cir.1982) ("It is well established that a government official may not bind the United States by entering into a contract to perform unauthorized acts.") (citations omitted); *Kuehne & Nagel, Inc. v. United States*, 17 Cl.Ct. 11, 15 (1989) ("Neither the government nor the party with whom it deals will be bound by a contract executed by a government agent acting outside the bounds of his authority.") (citation omitted); *see Augusta Aviation, Inc. v. United States*, 671 F.2d 445, 448–50 (11th Cir.1982) (where government agents' actions were unauthorized by statute, any contract entered into in reliance on that action is void for lack of authorization); *American President Lines, Ltd. v. United States*, 10 Cl.Ct. 1, 6 (1986) ("The Government, of course, cannot do by contract what it lacks authority to do by statute.") (citations omitted).

---

1. This order provided, in pertinent part:

 Defendant moved concurrently for summary judgment and to suspend discovery on January 23, 1989. The prior judge did not act on the motion to suspend discovery. RUSCC 12(i) states a preference that discovery continue pending resolution of a dispositive motion absent good cause shown. Judges of the Claims Court have entered orders suspending discovery pending the resolution of a dispositive motion unless the movant shows that the discovery relates to matters to be argued in opposition. *See, e.g., Reliance Ins. Co. v. United States*, 18 Cl.Ct. 359 (1989) (order granting motion to suspend discovery pending resolution of partial summary judgment motion). In opposing defendant's motion, plaintiff had the right, pursuant to RUSCC 56(g), to submit an affidavit detailing its needs to conduct discovery in order to oppose the motion. *Dunkin' Donuts of America, Inc. v. Metallurgical Exoproducts Corp.*, 840 F.2d 917, 919 (Fed.Cir. 1988); *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1566–67 (Fed.Cir. 1987). However, the Federal Circuit has cautioned that an opponent must demonstrate the need for discovery or a judge properly may stay discovery once the summary judgment motion has been filed. *New America Shipbuilders, Inc. v. United States*, 871 F.2d 1077, 1081 (Fed.Cir.1989). As defendant points out in its reply, plaintiff failed to invoke the procedures of Rule 56(g), and it is too late to do so now that briefing is completed.

 Defendant moved to suspend discovery so as to relieve itself from responding to discovery requests. Since plaintiff had not responded to this motion nor sought to develop its own evidence to oppose summary judgment, as permitted by Rule 56(g), the October 23 order was intended to put plaintiff on notice, prior to the scheduled argument, that plaintiff had to make some cognizable showing to avoid summary judgment. Despite a lively discussion during argument of what might have been shown, this plaintiff failed to do. Plaintiff thus failed to interpose a bar to defendant's motion, and, as discussed in the text of this opinion, defendant established its entitlement to summary judgment in the manner contemplated by RUSCC 56(c).

The issue then becomes whether the Government may be bound by the unauthorized acts of its agents. The answer is no. *See Schweiker v. Hansen,* 450 U.S. 785, 788–90, 101 S.Ct. 1468, 1470–72, 67 L.Ed.2d 685 (per curiam), *reh'g denied,* 451 U.S. 1032, 101 S.Ct. 3023, 69 L.Ed.2d 401 (1981). While recognizing that such a harsh rule may bring about hardship to a private litigant, the Supreme Court stated that "[w]hatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority...." *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).[2]

That language applies equally to this case even though plaintiff had no knowledge that the agents, in fact, were working for the Government. By definition a sting operation requires undercover status. To require the agents to properly identify themselves so as to put their targets on notice of the extent of their authority obviously would run counter to and frustrate the objectives of all similar undercover operations.

*Angel v. Seattle–First National Bank,* 653 F.2d 1293 (9th Cir.1981), cited and heavily relied upon by plaintiff, involved a sting operation whereby the Government, in an undercover capacity, purchased paintings directly from an innocent owner. The Government then used the paintings to catch unrelated third parties in a smuggling enterprise. The court ordered the Government, through the bank used by it, to pay the innocent owner the agreed-upon purchase price of the paintings. This case is inapplicable for two reasons. Plaintiff was not an innocent purchaser. Also, *Angel* does not involve an undisclosed principal. The Ninth Circuit was not presented with the privity issue because the Government knew exactly with whom it was dealing at all times. Thus, *Angel* does not mandate that this court ignore the clear and relevant precedent of the Federal Circuit requiring actual authority on the part of a government agent before the Government may be sued for breach of contract. No implied or express contract existed between the Government and plaintiff due to lack of actual contracting authority on the part of the agents.

■ 3. Plaintiff further alleges that its money was unlawfully taken without just compensation in violation of the fifth amendment of the United States Constitution. Defendant counters that no such claim may stand where the Government acts pursuant to its police powers and independently of fifth amendment rights.

In *Jarboe–Lackey Feedlots, Inc. v. United States,* 7 Cl.Ct. 329 (1985), this court had the opportunity to distinguish between property taken under the fifth amendment and property acquired through the exercise of the Government's police powers. The three-part inquiry identified by the Supreme Court to establish whether a compensable taking occurred requires the court

---

**2.** The Supreme Court has not said that estoppel may never lie against the Government. *Heckler v. Community Health Servs. of Crawford County, Inc.,* 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). Indeed, the Court noted its reluctance to hold that "there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with the Government." *Id.* at 60–61, 104 S.Ct. at 2224 (emphasis in original; footnote omitted). Therefore, it is within the realm of possibilities that the Government may be estopped from denying liability for its agents' inequitable conduct where such conduct extinguished a vested property right. *United States*

v. *Locke,* 471 U.S. 84, 112, 105 S.Ct. 1785, 1802, 85 L.Ed.2d 64 (1984) (O'Connor, J., concurring). But this language merely states a possible exception to the rule and not the rule itself. *National Audubon Soc'y,* 678 F.2d at 308; *Augusta Aviation,* 671 F.2d at 449. For example, in *New England Tank Industries v. United States,* 861 F.2d 685, 693 (Fed.Cir.1988) (Markey, C.J.), a unique case in which the Government was estopped to deny responsibility for its actions when the Government's decision not to publish relevant regulations deprived plaintiff of the means to determine whether government agents' actions were unauthorized and where plaintiff did not attempt to bind the Government to the contract or to its agents misrepresentations, but merely sought that the contract be terminated.

to inspect "'the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations.'" *Jarboe–Lackey*, 7 Cl.Ct. at 338 (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984) (citations omitted)). *Morton–Thiokol, Inc. v. United States*, 4 Cl.Ct. 625, 629–31 (1984), considered the differences between government action constituting an exercise of police power and a compensable taking and found the distinction based on whether the government action secures a benefit for or prevents harm to the public. If the latter is present, the Government exercised its police powers; if the former exists, a taking occurred. *Accord Jarboe–Lackey*, 7 Cl.Ct. at 338–39 (citations omitted).

Only the use of police powers was manifested in this case. There may be no interference with reasonable investment-backed expectations because plaintiff, through its agents Ojeda and Broder, was informed upon at least three occasions that the parts for sale could not be exported legally without State Department approval. Plaintiff, then, bought the parts knowing that they must be exported illegally in order to realize a profit on the transaction. Such an investment-related expectation is not reasonable. Further, the Government acted to prevent and deter future illegal exportation of classified military equipment. Such action obviously was intended not for public use but, rather, to prevent public harm. No compensable taking occurred.

■ 4. Similarly, plaintiff's fifth amendment due process claim must fail. Plaintiff alleges violation of its due process rights because of similar government conduct in the "Iran–Contra" affair. This court has jurisdiction only over claims for money damages. 28 U.S.C. § 1491(a)(1) (1982). As noted above, plaintiff's fifth amendment takings claim is without merit. Therefore, in order for plaintiff to sustain its fifth amendment contention, it must somehow allege that its due process claim

is a claim for money damages. This plaintiff cannot do. "'[T]he first amendment, *standing alone*, cannot be ... interpreted to command the payment of money' and therefore cannot support the Claims Court's jurisdiction under the Tucker Act. The same holds true for the due process clause of the fifth amendment." *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir.1989) (quoting *United States v. Connolly*, 716 F.2d 882, 887 (Fed.Cir.1983) (en banc), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984) (emphasis added)). Plaintiff's fifth amendment due process claim is not a claim for money damages and, therefore, is beyond this court's jurisdiction.

Further, even if such a claim was cognizable it still must not pass muster. Contentions that the United States itself was engaging in arms sales to Iran at the very time Customs was operating its "Operation Exodus" sting operation do not rise to a level of constitutional moment. In the case at bar, the Government attempted to enforce its laws by conducting a sting operation. The "Iran–Contra" affair is wholly irrelevant to this matter. *See United States v. Evans*, 667 F.Supp. 974, 990–91 (S.D.N.Y.1987) (defendants, who pleaded the Government's culpability in "Iran–Contra," convicted of conspiracy to violate the Arms Export Control Act).[3]

■ 5. Plaintiff next asserts that the Government's deposit of the $619,300.00 check creates an implied-in-fact contract of bailment. This court's jurisdiction is invoked when the Government seizes merchandise under the Customs laws because the Government "voluntarily enters into an implied-in-fact contract of bailment with the owner." *Kuehne & Nagel*, 17 Cl.Ct. at 17 (citations omitted). While obviously true that an implied-in-fact contract of bailment may result from governmental seizure of merchandise or money, no bailment took place here. Bailment connotes a trust or an understanding that one party will deliver personal property to another for a

---

**3.** Plaintiff's proffered references to B. Honegger, *October Surprise* (1989), objected to by defendant, which plaintiff's counsel described at argument as "something the court should be aware of," are irrelevant.

certain purpose, with the express or implied understanding that the chattel will be returned or accounted for when the purpose is accomplished or when reclaimed by the bailor. *Id.* at 18; *see Hatzlachh Supply Co. v. United States,* 7 Cl.Ct. 743, 748 (1985). No bailment existed when Ojeda handed the $619,300.00 check to the agents because he did so under the belief that he was completing a contract. He exchanged the check for the parts. Ojeda neither wanted nor expected the agents to hold the check in trust for return at a later date. Rather, Ojeda never wanted to see the check again. He received what he wanted and paid for: the parts. An implied-in-fact contract of bailment did not exist in this case.

■ 6. Defendant contends that all of plaintiff's claims must fail because they amount to nothing more than collateral attacks on the California federal district court's decision to deny Ojeda's motion for return of the money. This court agrees. The acts of a director or agent of a corporation are imputed to that corporation. *O'Brien Gear & Mach. Co. v. United States,* 219 Ct.Cl. 187, 199, 591 F.2d 666, 672 (1979); *Victory Carriers, Inc. v. United States,* 199 Ct.Cl. 410, 419, 467 F.2d 1334, 1341 (1972); *Radio Corp. of America v. Radio Station KYFM,* 424 F.2d 14, 19 (10th Cir.1970). In the present case, not only was Ojeda an original director of plaintiff, he also was one-half to one-third owner, as well as an active participant in the running of its day-to-day operations and had authority to co-sign financial obligations. Ojeda's actions clearly must be imputed to plaintiff.

In spite of this knowledge, plaintiff did not once attempt to intervene in the California proceedings, even though Ojeda was its authorized agent acting with its express authority. Ojeda or plaintiff could have appealed the denial of the motion for return of the money to the Ninth Circuit. Both failed to appeal and, instead, plaintiff

waited three years before again raising its claim to the money in this court.

The four-prong test to determine whether a party is collaterally estopped requires that there "must be identical issues, actually litigated in an action in which the party to be estopped is fully represented and which generates findings necessary to judgment." *Jarboe–Lackey,* 7 Cl.Ct. at 336 (citing *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,* 723 F.2d 1566, 1569 (Fed.Cir.1983)).

The issue is identical here because the same $619,300.00 is involved in both suits. The issue of ownership actually was litigated due to the imputation of Ojeda's acts to his corporation. Although plaintiff itself chose not to intervene, it was fully represented by Ojeda, its co-founder, co-owner, and director. Finally, the California court generated all the necessary facts to render judgment by finding that Ojeda acted with plaintiff's express authority and that the parts' destination was Iran. Plaintiff is hereby estopped from again raising its claims.

7. Finally, plaintiff contends the Government would be unjustly enriched if allowed to retain both the funds and the parts. In essence, plaintiff seeks to enforce an implied-in-law contract, a contract over which this court lacks jurisdiction. *Hatzlachh Supply Co. v. United States,* 444 U.S. 460, 465 n. 5, 100 S.Ct. 647, 650 n. 5, 62 L.Ed.2d 614 (1980) (per curiam) (citations omitted).[4]

CONCLUSION

Based on the foregoing, defendant's motion for summary judgment is granted. The Clerk of the Court shall dismiss the complaint.

IT IS SO ORDERED.

4. All arguments of plaintiff not addressed specifically herein have been carefully considered and are rejected as without merit.