**INTERSTATE CIGAR COMPANY and ICC Indiana Warehouse, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

No. 93–59 C.

United States Court of Federal Claims.

Sept. 16, 1994.

Edward M. Joffe, Miami, FL, for plaintiffs.

Michael S. Kane, U.S. Dept. of Justice, Washington, DC, for defendant.

1. Seizure was authorized pursuant to 21 U.S.C. § 353, 18 U.S.C. § 545, and 18 U.S.C. § 1343.

2. The affidavit was supported in part by an "X" appearing at the end of the lot number, which may have signified that the lot was destined for export only. Further documentation of the shipment from the manufacturer to ICC's supplier,

## OPINION

HODGES, Judge.

Plaintiffs sue for damages resulting from a seizure of 6,058 bottles of the pharmaceutical drug Midrin from plaintiffs' warehouse during a criminal investigation. The Government retained all 6,058 bottles past the expiration date, rendering the drug worthless. Plaintiffs seek to recover the fair market value of the Midrin.

We cannot find that plaintiffs were innocent purchasers who were not knowledgeable of the drug diversion scheme. The Government demonstrated valid reasons to keep the Midrin pursuant to its exercise of police power. If plaintiffs could have prevailed otherwise, they did not prove damages.

## FACTS

Plaintiffs Interstate Cigar Company and ICC Indiana Warehouse (collectively, ICC) are wholesale distributors of pharmaceutical drugs. In June 1989, ICC purchased a large quantity of Midrin from Victor M. Castellon, a supplier in Louisiana. The expiration date on the Midrin was April 1991. Payment for the Midrin was made by wire transfer in the sum of $146,781. Of the 9,625 bottles purchased, only 6,058 bottles of Midrin were delivered to ICC before July 13, 1989.

On July 13, 1989, the United States District Court for the Southern District of Indiana issued a search warrant authorizing the United States Customs Service to seize the Midrin from ICC's Indiana warehouse.[1] The warrant was granted on the basis of an affidavit from United States Customs agent Vincent G. Klink, who swore that drugs intended "for export only" were being diverted to the domestic market.[2] Drugs labeled for export only may not be introduced into the domestic market for various reasons, including problems with recall and underselling of domestic distributors.[3]

Victor Castellon, stated, "This Order to be Exported Out of the USA."

3. Pursuant to 15 U.S.C. § 13, pharmaceutical manufacturers have a dual pricing system whereby prices for domestic wholesalers are higher than those of exporters and nonprofit organizations. "For export only" drugs cannot be sold

On July 14, the Government seized 6,058 bottles of Midrin from ICC's warehouse. Following the seizure, the Government held all 6,058 bottles as part of a criminal investigation of Victor Castellon, the regular supplier to ICC and seller of the seized Midrin. Charges were not filed against Castellon or ICC.

Four months later, in November 1989, ICC filed a complaint in the District Court for the Southern District of Indiana seeking return of the drugs pursuant to Fed.R.Crim.P. 41(e). The court found that ICC failed to show that no adequate remedy at law existed because it could recover damages under warranty from the seller.

ICC appealed, and the Court of Appeals for the Seventh Circuit reversed in March 1991. The court ruled that no further crimes could be committed if the drugs were returned, and that if ICC were a good faith purchaser, it would be the true owner of the drugs. The case was remanded to the district court for an explanation from the Government justifying retention of the Midrin.[4]

During the criminal investigation and prior to a decision after remand, the drugs expired and became worthless. The district court then dismissed the case.

ICC brought suit for damages against the United States in this court seeking fair market value of the Midrin. The claim focuses on three main issues that ICC contends render this a taking subject to just compensation: (1) the drugs could not be the instrumentalities of a crime because ICC as the owner of the Midrin was an innocent purchaser for value and had no knowledge of the criminal activities of the seller; (2) where an exercise of police power renders investment-backed property worthless the Government must provide compensation; and (3) the Government failed to institute a timely forfeiture proceeding.

on the domestic market because this would undercut domestic wholesalers who must meet the requirements of 15 U.S.C. § 13, from which exporters are exempt.

## DISCUSSION

The Fifth Amendment to the United States Constitution provides that the Government may not take private property for public use without just compensation. The Fifth Amendment guarantee of just compensation bars the Government from forcing persons to bear burdens which, in all fairness and justice, should be borne by the public as a whole. *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960).

Just compensation jurisprudence is fact-intensive. *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir.1983). The Supreme Court has identified three factors to consider in determining whether a compensable taking has occurred. These are the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations. *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984).

Courts have provided exceptions to the compensation requirement where the taking involves a seizure of property as evidence in a criminal investigation. *United States v. Premises Known as 608 Taylor Ave., Apartment 302, Pittsburgh, Pa.,* 584 F.2d 1297 (3d Cir.1978). Compensation is not required where the property is held through exercise of the power to protect the health, safety and welfare of the public. *Atlas Corp. v. United States,* 895 F.2d 745 (Fed.Cir.), *cert. denied,* 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990). *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The Government's position is that the Midrin was retained both as part of an ongoing criminal investigation to which plaintiff was suspected to be a party, and for protection of the public health.

4. The Circuit Court also addressed the contention that ICC had an adequate remedy against the supplier. It found that this was not enough to shield the Government from justifying possession of property validly purchased by ICC.

## A. Criminal Investigation

The Government may seize evidence for use in criminal investigations and for trial. 584 F.2d at 1302; *Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Essentially, the Government must have some interest in the seized property in order to retain it. 584 F.2d at 1303.

ICC argues that it was not the subject of a criminal investigation; instead, it was an innocent purchaser in a drug-diversion scheme. A good-faith purchaser of goods from one who obtained them by fraud nevertheless obtains good title. *Interstate Cigar Co. v. United States,* 928 F.2d 221 (7th Cir.1991); *Fryer v. Downard,* 134 Ind.App. 226, 187 N.E.2d 105, 107 (1963). If the purchaser does not show that it acted in good faith, it receives void title. Such a purchaser does not prevail over the defrauded seller.

A party must exhibit honesty in fact and fair dealing to act in good faith under Article 2 of the Uniform Commercial Code. *In re Coast Trading Co., Inc.,* 744 F.2d 686 (9th Cir.1984). For ICC to be afforded ownership rights to the Midrin, it must show that in purchasing the drugs it had no knowledge or reason to know of Castellon's illegal diversion. *In re Wiltron Associates, Limited,* 49 F.R.D. 170 (S.D.N.Y.1970) (refusal to return property seized in criminal investigation where ownership disputed). Testimony and evidence at trial suggested that ICC should have known that the drugs purchased were diverted from intended export, and therefore illegal on the domestic market.

ICC based its case on the testimony of Paul M. Cohen, the former Director of Pharmaceutical Sales at ICC who negotiated purchase of the Midrin. Cohen stated in response to an interrogatory that ICC had no purchasers for resale of the Midrin at the time of the seizure. This response was controverted by proof at trial that most of the drugs had been sold over a six-state area. Mr. Cohen's conflicting testimony showed that ICC attempted to hide its sale of the drugs to subsequent purchasers.

A dispute at trial over the selling price of the Midrin was important because a deeply discounted price may reveal diverted drugs. Cohen testified that his selling price was in the range of $17.75 to $18.50. The resale invoices showed that ICC charged its customers $16.29 to $17.40. Cohen's testimony was not credible in these key areas.

Documents pertaining to the purchase and resale of the Midrin were missing at trial, although defendant had requested these documents. They may have been discarded by ICC following seizure of the Midrin. ICC contends that the documents were in a file cabinet sold to Interstate Distributors in 1990. According to ICC, the file cabinets and all documents in them were auctioned off and presumably destroyed during a foreclosure sale in 1991. If so, they were sold while ICC was pursuing a Rule 41(e) request for return of seized goods in district court.

The Government argues that these documents may have assisted its defense and been detrimental to ICC's case. We may infer that a party disposing of documents in such circumstances is not acting in good faith. *Hendler v. United States,* 952 F.2d 1364 (Fed.Cir.1991); *Eaton Corp. v. Appliance Valves Corp.,* 790 F.2d 874, 878 (Fed. Cir.1986).

While ICC was initiating a Rule 41(e) proceeding, with a possible indictment pending, it should have made every effort to retain documents of the sale and resale to support its claim of innocence. By not securing and using these documents to support its case, ICC allows us to infer that the documents would have damaged its case. Furthermore, ICC did not make a reasonable attempt to recall the documents when they were requested by the defendant. ICC provided the Government with information concerning the fate of the file cabinets only four business days before trial. This late disclosure did not cure the inference that the missing documents may have been damaging to ICC's case.

A pharmacist and former employee of Victor Castellon, Tommy J. Faucheaud III, testified under an agreement with the government. He supported defendant's argument that ICC knew about the drug diversion

scheme by his testimony that Cohen colluded with Castellon in a series of drug diversion transactions.

ICC's counsel showed the limitations on Faucheaud's credibility, and we acknowledge this.[5] However, his testimony was supported by evidence that drugs had been shipped by Cohen to Castellon in small plastic bags on prior occasions. Faucheaud testified that drugs in bags are intended to be samples and that selling drugs intended as samples is illegal. Faucheaud also testified that he was present when Castellon and Cohen discussed diversion schemes with other drugs, and that Cohen knew which companies could be defrauded easily. Faucheaud personally altered documents used by Cohen and Castellon.

■ ICC argued that it had good title to the illegally diverted drugs because it was a good faith purchaser for value. *See* U.C.C. § 2–403(1). However, a good faith purchaser is a person who did not know or could not have known that he or she should not purchase the goods. If ICC did not know that the drugs had been diverted, it reasonably should have known that the sale was suspect. In the circumstances presented, ICC should have investigated before selling the Midrin. It had a duty to inquire.

Defendant proved at trial that ICC bought the disputed drugs for $15.25 per bottle. This was an extremely low price that should have put ICC on notice that the drugs were diverted. This was verified by Carnrick, the manufacturer of the Midrin, whose employee stated at trial that such a discount would be much greater than normal. The domestic value of the drugs was approximately $22.65 per bottle wholesale. A discount as low as 1%–2% is typical in the industry, according to the manufacturer. Mr. Cohen testified that normally he received a 10–12% discount from the manufacturer's list price on Midrin from Castellon. Two pharmaceutical experts confirmed at trial that a price of $15.25, which is a 33% discount, should have made ICC suspicious.

The seized drugs contained an X at the end of the lot number. The meaning of the X and whether the X in the lot number should have put plaintiff on notice of the export restriction was disputed. An employee of the manufacturer testified that X is an internal means of determining which drugs are intended "For Export Only."

■ The drugs were shipped in a very large quantity at a substantial discount to a small corner drugstore. When it was seized, the Midrin was set out on pallets ready for distribution to domestic purchasers over a six-state area. Invoices for resale of the Midrin to ICC customers provided further evidence that the Midrin was to be diverted to the domestic market.

We were not persuaded by ICC's witnesses at trial, or by the evidence it presented. ICC did not receive good title to the drugs because it could not show that it was an innocent purchaser for value, acting in good faith. ICC had some knowledge or reason to know that the Midrin was diverted.

### B. Police Power

■ Defendant argues that it was exercising a legitimate police power in retaining the Midrin, even if ICC were found to be an innocent purchaser. The distinction between a non-compensable exercise of police power and a compensable taking turns on whether the Government action secures a benefit for or prevents harm to the public. *Scope Enterprises, Ltd. v. U.S.*, 18 Cl.Ct. 875, 883 (1989).

Defendant contends that sale of Midrin on the domestic market would have been a serious threat to public health. Defendant's contention is based on the fact that the manufacturer does not keep a list beyond immediate customers to be notified in the event of recall, and does not publish a list of recalled drugs restricted to export only. As a result, the manufacturer would not know whom to contact in case the drugs were recalled. Also, the Government retained the drugs to curb the illegal operation of a diversion market for prescription drugs.

---

**5.** Mr. Faucheaud's problems with the law are a matter of record, and we are aware that his cooperation with federal authorities in this case may have been related to those problems. Nevertheless, we did not determine during trial that his testimony was not credible overall.

 ICC claims that an exercise of police power that interferes with an investment-backed expectation is a compensable taking. This court found that an investment-backed expectation in the sale of arms was not reasonable where plaintiff knew that the parts could not be exported legally without State Department approval. *Scope Enterprises*, 18 Cl.Ct. at 883. The parts must have been exported illegally to realize a profit. The Government acted to prevent and deter future illegal exportation of classified military equipment in seizing the parts, so the action was intended to prevent public harm. No compensable taking had occurred. *Id.* at 883.

In this case, ICC claims it was denied a reasonable investment-backed expectation in the Midrin. However, it did not show what it could have done with the Midrin had the drugs been returned. ICC did not establish that it could have sold the goods for export. The only option presented by ICC was to sell the Midrin on the domestic market, and this would have been illegal.

 ICC did not establish a value for the drugs. The burden of establishing the value of the property taken rests upon the claimant. The sovereign must pay only for what it takes, not for lost opportunities. *Hedstrom Lumber Co. v. United States*, 7 Cl.Ct. 16, 28 (1984). ICC paid $15.25 per bottle of Midrin, but it claims that $18.25 is the value it could expect to receive from sale of the drugs on the domestic market. The drugs may have had value on the international market, but not on the domestic market. Experts at trial testified that they would not have purchased the Midrin. ICC acknowledged that drugs intended for export only would not be of value, and should be returned under normal circumstances. ICC offered no proof of Midrin's value on the international market.

ICC claims that it paid $146,781.25 for 6,058 bottles of Midrin. Documentation of the sale from Castellon does not support this. ICC paid for 9,625 bottles; 3,567 were not seized.

### C. Forfeiture Issue

 ICC argues that the Government did not initiate a proper forfeiture proceeding.

Forfeiture proceedings regarding property are statutory proceedings which cannot be maintained unless authorized by an applicable statute. *United States v. Brant*, 684 F.Supp. 421, 424 (M.D.N.C.1988) (quoting *United States v. Lane Motor Co.*, 199 F.2d 495, 496–97 (10th Cir.1952), *aff'd*, 344 U.S. 630, 73 S.Ct. 459, 97 L.Ed. 622 (1953)). The cases cited by ICC for this requirement involved seizures made under statutes mandating a subsequent forfeiture proceeding. *See, e.g., United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8850) in United States Currency*, 461 U.S. 555, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983); *United States v. Premises Known As 608 Taylor Ave., Apartment 302, Pittsburgh, Pa.*, 584 F.2d 1297 (3d Cir.1978); *Lowther v. United States*, 480 F.2d 1031 (10th Cir.1973). ICC did not identify any such statute applicable to this case.

### CONCLUSION

 ICC knew or should have known that the drugs purchased from Castellon were diverted illegally from the export market. Circumstances surrounding the purchase were suspicious enough that a good-faith purchaser would have inquired. We find as a matter of fact that ICC was not a good-faith purchaser in the circumstances of this case. If it were, ICC could not show the amount of damages, if any.

The Government could have withheld a token amount of the Midrin for evidence purposes and released the remainder, had ICC been an innocent purchaser. But ICC did not show what the remaining drugs would have been worth on the international market; it could not have sold them legally on the domestic market.

It is possible that drug enforcement authorities thought that ICC was an active participant in the drug diversion scheme and withheld all of the drugs for that reason. This does not matter because we are satisfied that ICC had a duty to inquire about the drugs' provenance.

We need not find that ICC knowingly participated in the illegal scheme for the purposes of this opinion, but we suspect that it did. Certainly, it would have required little

effort for ICC to learn that it was assisting in a criminal enterprise.

For these reasons, we direct the Clerk to enter judgment for defendant. Costs to defendant.